NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Civil Action No. 04-6433 (AET)** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **OPINION AND ORDER** |
| | : | |
| **MICHAEL BOJCUN,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## I.  INTRODUCTION

Currently before the Court is a Motion filed by Defendant, Michael Bojcun (hereinafter "Defendant") to Quash subpoenas issued to Anastasia Bojcun, Ihor Bocjun, and Alexandra Bojcun Pihut by Plaintiff, United States of America, (hereinafter "Plaintiff" or "United States" or "Government") [Docket Entry No. 31]. In the underlying case, Plaintiff seeks to deport and denaturalize the Defendant who allegedly served the Nazi Occupiers of the Ukrainian Socialist Soviet Republic (hereinafter "Ukraine"). For the following reasons and pursuant to the following limitations the Motion to Quash is DENIED.

## II.  STATEMENT OF FACTS

The United States seeks to deport and denaturalize Defendant, who allegedly served the Nazi occupiers of Ukraine as a member of the Ukrainian Auxiliary Police ("UAP") in L'viv, Ukraine from October 1941 until June 1944.   (Plaintiff's Brief in Opposition to Defendant's Motion to Quash

1

Subpoena at 1) (hereinafter "Opposition Brief").  The United States alleges that the Nazi occupiers of L'viv, with material assistance from the UAP, including Defendant, systematically persecuted and incarcerated 100,000 Jewish residents, before most of them were sent to their deaths in the gas chambers. (Id.).  Defendant allegedly contributed to the public intimidation of these residents in L'viv through his service as a uniformed and armed patrolman.  (Complaint at ¶ 22).  Defendant served in the Guard Company of the UAP in June 1944, and by July 1944, the Germans had evacuated L'viv.  (Complaint at ¶ 23).  Defendant, along with other members of the UAP, retreated westward with the Germans.  (Id.).

In September 1949, Defendant sought a determination from the United States Displaced Persons Commission (hereinafter "DPC") that he was a displaced person as defined in the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (hereinafter "DPA").  Subsequently, Defendant was determined to be eligible to immigrate to the United States under the DPA.  (Id. at ¶ 24).   The Government alleges Defendant falsely stated in his application to the DPC that he was an automobile mechanic in L'viv until July 1944.  (Id. at ¶ 25).  Relying on the information that the Defendant provided, the DPC determined that Defendant was an eligible displaced person. (Id. at ¶ 27).  Defendant filed an application for an Immigration Visa and Alien Registration with the American Consulate in Munich, Germany on or about October 6, 1949, and was interviewed by a United States Department of State Vice Consul on or about the same day.  (Id. At ¶ 28).  The Government alleges that the Defendant lied about his service in the UAP during this interview even though he orally swore to the truth of the information he provided.  (Id. at ¶ 29-30).  Defendant was issued Immigration Visa No. 5758/65 under the DPA and used this visa to enter the United States at the Port of New York on or about December 10, 1949.  (Id. at ¶ 31-32).

After residing in the United States for nearly twenty years, Defendant signed and filed a Petition

for Naturalization with the United States on June 15, 1969 and orally swore to the truth of the information he provided therein.  (Id. at ¶ 33).  On August 29, 1960, the United States District Court for the District of New Jersey issued Defendant a Certificate of Naturalization.  (Id. at 34).  Plaintiff alleges that Defendant lied about his wartime activities to improperly gain entry to the United States and was later naturalized based upon this false information.  (Id. at ¶ 29, 33).

Defendant's wife, Anastasia Bojcun, (hereinafter "Anastasia")  is of Ukranian ancestry, and was born on May 8, 1924, near the present day city of L'viv, Ukraine.  (Opposition Brief at 15).  Anastasia and Defendant were married on May 1, 1943, in L'viv, at which time Defendant was already serving in the UAP.  (Id.)  Anastasia had been living in L'viv since at least 1938.  (Id.)  She was granted a visa to enter the United States on October 6, 1949, and became a naturalized citizen on August 29, 1960.  (Id. at 18).  Defendant's daughter, Alexandra Bojcun Pihut, (hereinafter "Alexandra") was born in the Ukraine in 1944 and immigrated to the United States with her parents.  (Opposition Brief at 19).  Defendant's son, Ihor Bojcun, (hereinafter "Ihor") was born in the United States in 1954.  (Opposition Brief at 19).

Defendant currently suffers from mental and physical disabilities.  (Defendant's Motion for Protective Orders[1] at 1) (hereinafter  "Moving Brief").  He has a history of cancer of the kidneys and renal carcinoma with a partial right nephrectomy.  (Id.).  Defendant also suffers from peripheral vascular disease, arteriosclerosis, and hypertension.  (Id.).  Defendant has been under the care of physicians and has suffered a noticeable loss of mental capacity.  (Id.).  Based on the progressive, irreversible, and permanent advance of his brain disease, Defendant was deemed incompetent by the New Jersey Superior

---

[1] Defendant improperly titled his motion as a Motion for a Protective Order.  The Court shall be referring to Defendant's motion as a Motion to Quash the Subpoenas issued by Plaintiff.

Court.  In the Matter of Michael Bojcun, an alleged Incapacitated Person, Sup. Court of N.J., Ch. Division, Mercer County, Docket No. 05-0038 (Dec. 23, 2004).  Ihor was appointed as the Conservator of his father as of December 23, 2004.  (Id.).

The United States seeks to revoke the Defendant's citizenship, to set aside the order of the United States District Court for the District of New Jersey admitting the Defendant to citizenship, and to cancel the Defendant's Certificate of Naturalization.  (Complaint at ¶ 1).  On March 16, 2006, the United States served subpoenas upon Defendant, Anastasia, Ihor, and Alexandra. [Docket Entry No. 28].  On April 24, 2006, Defendant moved to quash these subpoenas.  (Id. at No. 31).  Defendant argues that his mental and physical state prevent him from participating in any legal proceedings and he would be placed in serious physical risk should he be forced to submit to questioning by Plaintiff.  (Moving Brief at 1-2). Defendant further argues that the deposition of Anastasia should be prohibited because of her assertion of the adverse spousal privilege, expectation of invoking the Fifth Amendment, and because any questioning would create health risks.  (Moving Brief at 3).  Finally, Defendant argues that Ihor and Alexandra have no knowledge of relevant events.  (Moving Brief at 3-4).

On June 19, 2006, the parties reached an agreement regarding the deposition of Michael Bojcun. [Docket Entry No.40].  The United States agreed that it will not depose Defendant, and Defendant, in turn, has agreed that he will not testify at trial.  [Id.].  Therefore, the only issues remaining before the Court are Defendant's Motion to Quash the Plaintiff's subpoenas of Anastasia, Ihor, and Alexandra.

## III. LEGAL ANALYSIS

### A. LEGAL STANDARD

The scope of discovery in federal litigation is broad.  FED. R. CIV. P. 26 (b) (1).  The court's role is to protect privacy and confidentiality interests.  Pearson v. Miller, 211 F.3d 57, 65 (3d Cir. 2000). Thus, the court is "authorized to fashion a set of limitations that allow as much relevant material to be discovered as possible, while preventing unnecessary intrusions into legitimate interests that may be harmed by the discovery of material sought."  Id.  The court has the discretion to issue protective orders that impose restrictions on the extent and manner of discovery where necessary "to protect a person or party from annoyance, embarrassment, oppression, or undue burden or expense". FED. R. CIV. P. 26 (c). The information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.  Id.

An order to vacate a notice of taking of a deposition is generally regarded as both unusual and unfavorable.  Investment Properties Int'l Ltd. v. IOS, Ltd., 459 F.2d 705, 708 (2d Cir. 1972).  See also Salter Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979) (prohibition of deposition inappropriate absent extraordinary circumstances); Naftchi v. N.Y.U. Medical Center, 172 F.R.D. 130, 132 (S.D.N.Y. 1997) (it is exceedingly difficult to demonstrate an appropriate basis for an order barring the taking of a deposition).  With the heavy burden of persuasion borne by the party seeking a protective order, it is rare for a court to issue a protective order that prohibits the taking of a deposition.  Holm v. Pollack, 2001 WL 1257728, (E.D.Pa. 2001).  Such an order is only appropriate where the party seeking the order show good cause by demonstrating a specific need for protection.  Glenmede Trust Co. V. Thompson, 56 F.3d 476, 483 (3d Cir. 1995).  Good cause is established on showing that disclosure will result in a clearly defined and serious injury to the party seeking closure.  Publicker Indus., Inc. v. Cohen, 733 F.2d 1059,

5

1071 (3d Cir. 1984).  The court must balance the competing interests of allowing discovery and protecting parties and deponents from undue burdens.  In re Tutu Wells Contamination Litigation, 189 F.R.D. 153, 155 (D.V.I. 1999) (citing Bucher v. Richardson Hospital Authority, 160 F.R.D. 88, 92 (N.D. Tex. 1994)).  Factors that should be considered in the balancing test include: "whether [the] parties have [an] interest in privacy, whether [the] information is being sought for [a] legitimate purpose or for [an] improper purpose, whether there is [a] threat of particularly serious embarrassment to [either] party, whether [the] information is important to public health and safety, whether [the] sharing of [the] information among litigants would promote fairness and efficiency, whether [the] party benefitting from [the] confidentiality order is [a] public entity or official, and whether the case involves issues important to the public".  Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir.1994).

## B. ANASTASIA BOJCUN

In determining whether Plaintiff should be permitted to depose Anastasia, the Court must balance and analyze the various factors outlined in Pansy v. Borough of Stroudsburg.  In addition to the protections of Pansy, Anastasia has also affirmatively asserted the protections of two types of spousal privilege, and asserts "an expectation of invoking the Fifth Amendment."

### i. Pansy Factors

The protections outlined in Pansy do not preclude the deposition of Anastasia.  The first factor that the Court must consider is whether the deponent has an interest in privacy.  Id.  Anastasia and her husband have a valid privacy interest and that interest is protected through the multiple legal privileges that exist between married individuals.  Moreover, the parties agree that the Government cannot question Anastasia regarding privileged marital communications since Anastasia has asserted that particular

privilege, and that the Government may inquire as to any communications before Defendant and Anastasia were married.  Thus, any claim to privacy based on the marital communications that would preclude Anastasia's deposition has been rendered moot by the agreements of the parties.

The second factor that the Court must consider is whether the information is being sought for a legitimate purpose.  The Government is seeking information from Anastasia regarding her knowledge and observations concerning her husband's participation in the UAP and his entry into the United States.  The information is central to this litigation and resolution of the case and thus is being sought for a legitimate purpose.  See Charlie H. v. Whitman, 213 F.R.D. 240, 248 (D.N.J. 2003) ; Province v. The Pep Boys– Manny, Moe, Jack, 2000 WL 420626 at *3 (E.D. Pa. 2000).

Permitting the deposition of Anastasia will promote both fairness and efficiency, satisfying the fifth factor of the Pansy analysis.  The information that the Government reasonably believes Anastasia will provide is discoverable information and for efficiency purposes Anastasia is the next logical choice after Defendant, with relevant knowledge.  This is a unique case in which most of the events in question occurred over fifty years ago, and although this case was instituted in December 2004, it would be unnecessarily delayed if the Government was forced to seek depositions from Ukrainian residents or others instead of Anastasia.

The remaining Pansy factors, whether there is a threat of serious embarrassment, whether the issues are important to public health and safety, and whether there is a public entity or official involved or a strong public interest, were not addressed by either of the parties in their briefing and are not relevant to the instant case.

When balancing the Pansy factors it is clear that the parties, in their briefs, have stipulated that

the scope of the deposition would not invade Defendant's privacy in marital communications, the information being sought is for a legitimate purpose, and Anastasia's deposition would be the most efficient and least burdensome way to gain discoverable information. Thus when analyzing the competing interests of allowing discovery and protecting parties and deponents from undue burdens, it is clear that it would b proper for Anastasia to be deposed.

### ii. Spousal Privilege

In addition to the protections outlined in Pansy, Anastasia invokes two other types of privilege in support of the Motion to Quash the subpoena.  Anastasia claims she is protected by spousal privilege and also asserts an expectation of invoking the Fifth Amendment to the United States Constitution.  (Moving Brief at 3).

There are two distinct types of spousal privilege: 1) the privilege against adverse spousal testimony and 2) the marital communications privilege.  U.S. v. Ammar, 714 F.2d 238, 258 (3d Cir. 1983).  The former is designed to protect the marriage relationship as it exists at the time of trial and applies to testimony of any kind, while the latter reaches only communications made during the marriage and intended to be confidential.  Id.  The purpose of the marital communications privilege is to preserve and foster the intimate relationship between the married parties and to encourage communication.  Id.   The parties do not dispute that Plaintiff may not inquire as to privileged marital communications since Anastasia has asserted that particular privilege.  In addition, the parties agree that the government may inquire only as to communications before the Defendant and Anastasia were married.  Thus, the only issue concerning spousal privilege that remains to be considered is whether Anastasia can invoke the adverse spousal privilege.

8

The adverse spousal privilege remains a viable principle of federal law and is vested only in the testifying spouse. Trammel v. United States, 445 U.S. 40, 100 S. Ct. 906, 63 L.Ed.2d 186 (1980). The adverse spousal privilege allows one spouse to refuse to testify against the other in a criminal case on matters relevant to the guilt of the defendant spouse or matters that would implicate the defendant in other proceedings. Fallowfield Development Corp. v. Strunk, 1990 WL 52749 at *3 (E.D.Pa.) The adverse privilege is not limited to confidential statements, but instead includes testimony on all matters, including matters which occurred both before and during the marriage. Id. The purpose of adverse spousal privilege is to prevent disharmony and dissension in the marriage. The federal law implies that this type of privilege is only available in criminal proceedings. See Generally: In re Grand Jury Matter, 673 F.2d 688 (3d Cir. 1982); In re Malfitano, 633 F.2d 276 (3d Cir. 1980); United States v. Premises Known as 281 Syosset Woodbury Road, 862 F. Supp. 847, 850 (E.D.N.Y. 1994). The federal courts stress that the privilege should be limited to instances in which it makes the most sense, that is, where spouse, who is neither a victim nor a participant, observes evidence of the other spouse's crime. U.S. v. Van Drunen, 501 F.2d 1393 (7th Cir.), cert. den. 419 US 1091, 95 S. Ct. 684, 42 L. Ed. 2d 684 (1974).

There is some question as to whether this privilege applies in civil litigation and a reasonable argument can be made that it should be preserved in trials where life or liberty are at stake. Many have argued that deportation and denaturalization proceedings are just as harsh, if not harsher, than criminal proceedings, and that, consequently, one involved in a deportation or denaturalization proceeding should be offered similar safeguards to those offered in criminal proceedings. See Klapprott v. U.S., 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 266 (1949) (Denaturalization consequences may be more grave than consequences that flow from conviction for crimes); U.S. v. Kungys, 575 F.

9

Supp 1208 (D.N.J. 1983) (Denaturalization proceedings based on charges of World War II war crimes carry with them consequences far more severe than the penalties imposed in most criminal cases). Support for this argument lies in the idea that deportation strips an individual of the liberties one is entitled to, while living in the United States.  See Mejia Rodriquez v. Reno, 178 F.3d 1139, 1146 (11th Cir. 1999).  Thus, deportation places the "liberty of an individual at stake and visits a greater hardship on the individual by depriving him of the right to stay and live and work in this land of freedom". Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 119 S. Ct. 936, 142 L.Ed 2d. 940 (1999).  Consequently, the adverse spousal privilege *could* potentially be invoked in the instant matter on the theory that punishments resulting in deportation and denaturalization are of a criminal nature.

However, in the instant case, it is not necessary to fully defend the civil-criminal distinction in order to reject adverse spousal privilege because analogous case law provides that the adverse spousal privilege cannot be asserted here.  In Fallowfield Development Corp. V. Strunk, a case strikingly similar to the one at hand, the Eastern District of Pennsylvania held that since a state court deemed the defendant incompetent based on a profound and permanent loss of memory, his wife could not assert adverse spousal privilege.  Fallowfield Development Corp., 1990 WL 52749 at *3.  In that case, the defendant suffered irreparable brain damage as a result of a stroke, which caused a profound and permanent loss of memory and an impairment of his former language skills.  Id.  The court reasoned that the wife's testimony would not affect the marital relationship.  Id.  The court found further support in the fact that the defendant could not be deposed or called as a witness at trial.  Id. Consequently, the court held that the wife was an "important witness for the plaintiff's case" and that denying her deposition would be a derogation of the search for truth.  Id. at *4.  The court reasoned

that the assertion of the privilege must be in accordance with the purpose of the privilege: fostering the harmony and sanctity of the marital relationship.  Id. at *3.

Similarly, Defendant in the instant matter is deemed incompetent by the state and currently under hospice care.  (Moving Brief at 1).  Defendant asserts that he has a progressive, permanent, and irreversible brain disease and is "significantly compromised with short and long-term memory and higher cortical function".  (Moving Brief at 1).  Thus, as in Fallowfield Development Corp. v. Strunk, the wife's deposition will not disrupt the harmony of the marital relationship.  Furthermore, since the United States and Defendant have previously agreed that Defendant will not be deposed nor testify at trial, Anastasia remains an important witness and denying her deposition would be a derogation of the search for truth.  Since Defendant asserts that he is too incompetent to be deposed, he cannot argue that Anastasia's deposition will have an adverse effect on his marital relationship.

The Court finds that Anastasia may assert the marital communications privilege, but is not entitled to the adverse spousal privilege.  Thus, during her deposition, Anastasia cannot be questioned about any communications made during her marriage that were intended to be confidential.  However, since she cannot invoke the adverse spousal privilege, Anastasia can be questioned about any communications or events that occurred before the marriage and any first-hand observations she may have made both before and during the marriage.

### iii. Fifth Amendment

Defendant's Motion mentions that Anastasia is "expected to plead the Fifth Amendment as to any questions relating to the visa and naturalization processes, because if any of the information provided by Michael Bojcun is or may be a material misrepresentation of facts, she risks the probability of being denaturalized and/or deported."  (Moving Brief at 3).  Anastasia has no legal

basis upon which to assert a Fifth Amendment claim.

The Fifth Amendment privilege against self-incrimination protects against real dangers, not remote and speculative possibilities.  U.S. v. Mahasin, 362 F.3d 1071 (8th Cir. 2004).  Anastasia must have a reasonable cause to fear danger from answering the United States' questions.  U.S.C.A. Amendment Five.  It is the duty of the court to decide whether the request to deny the deposition is justified.  Id.

The statute of limitations for any criminal acts that Anastasia may have committed when applying for a visa or becoming a naturalized citizen have expired, and therefore Anastasia does not have any reasonable cause to fear punishment for answers she may provide during her deposition. See 18 U.S.C. § 3291.  In addition, the Office of Special Investigations has "never brought a denaturalization or deportation case against the spouse or child of any of its subjects".  (Opposition Brief at 18).  It should also be noted that while denaturalization is a punishment that is arguably as harsh as a criminal penalty, Anastasia does not face any criminal penalties and thus Anastasia cannot reasonably fear self-incrimination.  Therefore, Anastasia cannot invoke the Fifth Amendment as to any questions relating to the visa and naturalization process.

### C. IHOR and ALEXANDRA

The Defendant claims that deposing Ihor and Alexandra can only be described as harassment since neither of the children have any personal knowledge of the events described in the complaint. The defense believes that questioning Defendant's children will not lead to admissible evidence.

The protections outlined in Pansy do not preclude the depositions of Alexandra and Ihor.  The Government is not seeking to depose Alexandra and Ihor for an improper purpose, but instead because it is unable to obtain the necessary information from their incompetent father.  Thus, the

depositions of Alexandra and Ihor will promote fairness and efficiency in the discovery process. Defendant's children do not have a particularly important privacy interest nor are they subject to a serious risk of embarrassment. The information sought is not important to public health or safety, does not involve a public official, and the issues raised are not of great importance to the public.

While Defendant may be correct in his assertion that the depositions of both Ihor and Alexandra will not lead to admissible evidence, he has not met his burden in making this assertion. Since it is both unusual and unfavorable to grant a protective order denying a deposition, Defendant must show good cause by demonstrating a particular need for protection. <u>Glenmede Trust Co. v. Thompson</u>, 56 F.3d 476, 483 (3d Cir. 1995). To show good cause, the defense must establish that disclosure will result in a clearly defined and serious injury to both Ihor and Alexandra. Since Defendant's brief was unpersuasive in demonstrating good cause and has not raised any such injury that may result from the depositions, his Motion to Quash the subpoenas of both Alexandra and Ihor must be denied.

## IV.  CONCLUSION

For the aforementioned reasons, IT IS on this 24th day of July 2006,

ORDERED that Defendant's Motion to Quash the subpoena issued to Michael Bojcun is Dismissed as MOOT; and it is further

ORDERED that Defendant's Motion to Quash the subpoenas issued to Anastasia Bojcun, Alexandra Bojcun Pihut, and Ihor Bojcun are DENIED; and it is further

ORDERED that a conference call will be held with the undersigned on <u>August 24, 2006 at 2:30 P.M.</u>  Plaintiff shall initiate the call.

**s/ Tonianne J. Bongiovanni**
**TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**
